**CALLAWAY GOLF CORPORATION, a California corporation, Plaintiff,**

v.

**ROYAL CANADIAN GOLF ASSOCIATION, a Canadian non-profit association, Defendant.**

**No. SA CV 00–445 AHS.**

United States District Court, C.D. California, Southern Division.

Dec. 21, 2000.

Robert E. Gooding, Jr., William C. Rooklidge, Matthew N. Falley, Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Irvine, CA, for plaintiff.

Ronald L. Olson, Charles D. Siegal, Natalie Pages Stone, Munger, Tolles & Olson, Los Angeles, CA, for defendant.

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

STOTLER, District Judge.

### I.

### *INTRODUCTION*

The Royal Canadian Golf Association made public its decision to preclude use of named golf clubs in its regulation golf tournaments. Plaintiff's golf club was mentioned in the Canadian association's announcement by its Callaway name, after which plaintiff filed this lawsuit against defendant alleging claims for, *inter alia,* trade libel, defamation, interference with contract, interference with prospective economic advantage, and violation of California's Unfair Competition Act. After due examination of the parties' papers and independent research, the Court concludes that it lacks jurisdiction over the Canadian defendant whose mode of public announcement did not subject it to personal jurisdiction in this forum. For reasons discussed below, the Court grants defendant Royal Canadian Golf Association's Motion to Dismiss For Lack of Personal Jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).

### II.

### *PROCEDURAL BACKGROUND*

On June 20, 2000, plaintiff Callaway Golf Corporation (Callaway) filed a First Amended Complaint ("Complaint") against defendant Royal Canadian Golf Association (RCGA) for (1) violation of California Business and Professions Code § 17200 (unfair competition); (2) intentional interference with contract; (3) negligent interference with contract; (4) intentional interference with prospective economic advantage; (5) negligent interference with prospective economic advantage; (6) promissory estoppel; (7) negligence; (8) breach of fiduciary duty; (9) trade libel, and (10) defamation.

On July 18, 2000, RCGA filed a motion to dismiss the First Amended Complaint for lack of personal jurisdiction under Fed.

R.Civ.P. 12(b)(2). The matter was set for hearing on the Court's October 30, 2000 hearing calendar. On October 17, 2000, Callaway filed its opposition, and defendant timely filed its reply on October 25, 2000. Under Local Rule 7.11, the Court took the matter under submission without hearing.

### III.

### *FACTUAL SUMMARY*

Callaway is a Delaware corporation headquartered in California, self-described as "the most successful manufacturer and seller of golf equipment in the world." Compl. at 3:9–10. According to the Complaint, plaintiff manufactures numerous well-known golf clubs including a trademarked series entitled "BIG BERTHA." Compl. at 3:12–14. Callaway also manufactures the ERC Forged Titanium Driver ("ERC driver"), the type of club around which this litigation centers.

In addition to the allegations of the Complaint, the parties submit evidentiary support for their positions. Defendant submits the declaration of Stephen Ross, the RCGA's Executive Director who sets forth the status, nature, and business of the RCGA and who describes the Association's Web sites as "principally informational" and outlines the commercial opportunities available via the sites. Defendant's counsel, Natalie Stone, submits copies of the parties' Web pages, including the offending "press releases" that appeared on the RCGA Web site. In a separate volume, defendant's counsel attaches additional, extensive evidentiary materials, referred to or summarized hereinafter.

Plaintiff submits the declaration of the William MacKenzie, Vice President and General Manager of Callaway Golf Canada, a subsidiary of plaintiff Callaway, who concludes that the RCGA must have known, at the time of issuing its press releases, that the plaintiff is based in the State of California in the United States.

Plaintiff's Senior Executive Vice President and Chief Legal Officer, Steven McCracken, explains the background of the development of the ERC Driver, and the existence of many other golf equipment manufacturers located in Southern California. He also emphasizes the significant detriment to plaintiff if its lead counsel were to become unavailable by virtue of this case being prosecuted outside the U.S., since Mr. Decof, according to the declarant's understanding, cannot be admitted to the bar in Canada because the Canadian courts do not provide reciprocity. Other evidentiary submissions, or summaries thereof, are noted throughout this Order.

Defendant RCGA is a non-profit Canadian company chartered by the Canadian government as the governing body of Canadian men's amateur golf. Defendant conducts 10 national golf championships for amateurs in Canada and sponsors two professional golf tournaments in Canada. Defendant also administers the rules governing the game of golf in Canada, provides handicapping services and course ratings in Canada, and through publications and seminars, provides instruction to member clubs in Canada. Defendant also maintains two Web sites, one in English, one in French, through which, *inter alia,* defendant provides information to its members and other golfers, hosts a "Guestbook" for responding to questions from site users, and makes sales of tickets to its two professional tournaments and sales of various golf-related publications. Defendant also posts press releases providing news about RCGA tournaments, the performance of Canadian golfers in international events, information about the game of golf in Canada, and RCGA decisions. Its Internet server is asserted to be located elsewhere than in California.

On April 13, 2000, the United States Golf Association (USGA), RCGA's U.S. counterpart, announced in a press release that the USGA deemed eleven clubs made by eight manufactures as "non-conforming" with USGA standards due to their spring-like effect, which allows golfers to hit balls farther than conforming clubs. Callaway's "E.R.C., FORGED, TITANIUM, 11°, Callaway GOLF" was included on this list.

On April 17, 2000, RCGA's Rules Committee met to discuss the USGA's decision with regard to the ERC driver. A transcript of the meeting indicates that the Rules Committee's discussion of Callaway's ERC driver was prompted, at least in part, by both an article in *Golf Week* magazine on the spring-like effect of the ERC driver and recent inquiries from the media and Callaway as to whether the driver will be deemed non-conforming in Canada. Stone Decl. filed October 25, 2000 (Stone Decl. II), Ex. J at 88. After some discussion of the USGA's decision, the ERC driver, and the propriety of following the USGA's decision, the Rules Committee voted to support the USGA's decision regarding the ERC driver.

On April 18, 2000, RCGA issued a press release announcing its decision to support the USGA and to deem Callaway's ERC drivers non-conforming for the same reason cited by the USGA. The press release did not specify a particular model of ERC driver as non-conforming, but referred only to the "Callaway ERC driver." Stone Decl. filed July 18, 2000 (Stone Decl. I), Ex. B–7. Defendant distributed the press release to over 100 Canadian media contacts and four U.S. publications with nationwide distribution, and it posted the press release on its Web site. None of the four U.S. media publications to which RCGA sent the press release is located in California, nor did defendant send press releases to any entity or person with a California address.

On May 5, 2000, the RCGA issued another press release announcing it had also found non-conforming the other 10 drivers listed in the USGA's April 13, 2000 press release and limited the ban on Callaway's ERC drivers to the ERC 11° driver. Copies of the April 18 and May 5, 2000 press releases are attached as Appendices A and B, respectively, to this Order (there are

two copies of each due to the different ways the parties downloaded the hard copies, plaintiff's copy first, then defendant's).

Callaway alleges that the RCGA's "actions" were arbitrary, capricious, unfair, discriminatory, inconsistent, wanton, and reckless; harm Callaway's sales of ERC drivers; impact negatively on Callaway's reputation, relationship with its customers, and the sales of Callaway's other golf products; and, have caused injury to Callaway's goodwill. Callaway seeks compensatory and punitive damages, as well as injunctive relief. Compl. 8:16–23.

## IV.

## DISCUSSION

▮ Where, as here, there is no applicable federal statute governing personal jurisdiction, the Court applies the law of California. *See Panavision International v. Toeppen,* 141 F.3d 1316, 1318 (9th Cir. 1998). Under California law, the district court may exercise jurisdiction "on any basis not inconsistent with the Constitution of [California] or the United States." Cal. Civ.Proc.Code § 410.10.

In the absence of the traditional bases for jurisdiction, such as in-state physical presence, domicile or consent to service of process, the Constitution requires that the defendant have "certain minimum contacts with the [forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. State of Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

▮ Personal jurisdiction over a nonresident defendant may be either general or specific. Plaintiff asserts that specific jurisdiction is "clearly" appropriate. Opp'n at 8 n. 8. "Specific jurisdiction" is jurisdiction which arises when a defendant's contacts with the forum state are the activities giving rise to the litigation. *See, e.g., Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 477–78, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985).

▮ The Court of Appeals for the Ninth Circuit applies a three-part test to determine if a defendant's contacts are sufficiently related to the forum state to permit a district court to exercise specific jurisdiction:

(1) The nonresident defendant must do some act ... by which he purposely avails himself of the privilege of conducting activities in the forum ... (2) the claim must be one which arises out of or results from defendant's forum-related activities; and (3) exercise of jurisdiction must be reasonable.

*Omeluk v. Langsten Slip,* 52 F.3d 267, 270 (9th Cir.1995). If the district court does not hold an evidentiary hearing, the plaintiff has the burden of establishing a prima facie case for personal jurisdiction. *See Bancroft & Masters v. Augusta National, Inc.,* 223 F.3d 1082, 1087 (9th Cir.2000). "That is, the plaintiff need only demonstrate facts that if true would support jurisdiction over the defendant," and the Court must accept plaintiff's factual allegations as true. *Ballard v. Savage,* 65 F.3d 1495, 1498 (9th Cir.1995); *see also Bancroft & Masters v. Augusta National,* 223 F.3d at 1087.

Applying these standards, the Court finds that Callaway does not establish a prima facie case for personal jurisdiction over the RCGA for any of the claims alleged in the Complaint.

### A. Purposeful Availment

▮ A court may exercise specific jurisdiction over a non-resident defendant only when the defendant "purposely availed himself of the privileges of conducting activities in the forum." *Bancroft & Masters v. Augusta National,* 223 F.3d at 1086. The " 'purposeful availment' requirement is satisfied if the defendant has taken deliberate action within the forum state or if he has created continuing obligations to forum residents." *Ballard v. Savage,* 65 F.3d 1495, 1498 (9th Cir.1995). Callaway asserts two independent bases for the Court to find that the RCGA purposely

availed itself of the protections and privileges of California law: (1) application of the "effects test" for purposeful availment to defendant's conduct, and (2) defendant's maintenance of an interactive, commercial Internet Web site. Opp'n at 11:8–17, 12:4–18, respectively.

### 1. Effects Test for Purposeful Availment

■ Under the "effects test," the purposeful availment requirement is satisfied when a non-resident defendant undertakes activities outside the forum state that are both aimed at and have their primary effect in the forum state. *See Calder v. Jones,* 465 U.S. 783, 789–90, 104 S.Ct. 1482, 1487, 79 L.Ed.2d 804 (1984). The Ninth Circuit articulates the effects test as a three-part test requiring that personal jurisdiction be predicated on (1) intentional actions that are (2) expressly aimed at the forum state, and (3) cause harm, "the brunt of which is suffered—and which the defendant knows is likely to be suffered—in the forum state." *Core–Vent v. Nobel Industries,* 11 F.3d 1482, 1486 (9th Cir. 1993); *see also Bancroft & Masters v. Augusta National,* 223 F.3d at 1087. The effects test can be satisfied "when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom defendant knows to be a resident of the forum state." *Bancroft & Masters v. Augusta National,* 223 F.3d at 1087.

■ Relying heavily on the *Bancroft & Masters* holding, Callaway argues that all three requirements of the effects test are met because defendant targeted its wrongful actions at plaintiff, and "based on the objective evidence, [defendant] must be assumed to have known [plaintiff] to be located in California." Opp'n at 14–16. Callaway asserts that the RCGA is chargeable with knowing that plaintiff is located in California because (1) "the very Golf Week article upon which the RCGA's Rules Committee based it's [sic] deliberation specifically identifies Carlsbad, California, as Callaway's headquarters;" (2) the "Golf Canada magazine published by the RCGA . . . regularly received from Carlsbad, California, shipments of artwork for use in Callaway Golf advertising," as well as "media kits and press releases identifying Callaway Golf's Carlsbad facility as the place to which inquiries should be directed;" (3) the Glen Abbey Golf club, formerly owned by defendant, "regularly received for sale substantial shipments of Callaway Golf products from Carlsbad that prominently identified Callaway Golf as being located in California," and (4) California is the "focal point of the golf equipment manufacturing industry in the western hemisphere." Opp'n at 9 n. 9.

Even if the Court accepts plaintiff's allegations that the RCGA expressly targeted its April 17, 2000 decision and April 18, 2000 press release at plaintiff—a contention the parties dispute—plaintiff does not adduce facts sufficient to establish that defendant knew or should have known plaintiff was a resident of California, had its principal place of business in California, or otherwise would feel the brunt of the effects of defendant's actions in California.

■ The *Golf Week* article does not state that plaintiff's headquarters are in Carlsbad, California, but only notes that "the [ERC] drivers are being assembled exclusively at the Callaway plant in Carlsbad, Calif." Stone Decl. II, Ex. F at 68. Merely knowing a corporate defendant might be located in California does not fulfill the effects test. *See Bancroft Masters v. Augusta National,* 223 F.3d at 1087 (rejecting "broad proposition that a foreign act with foreseeable effects in the forum state always gives rise to specific jurisdiction"); *see also Panavision Int'l v. Toeppen,* 141 F.3d at 1322 (finding "there must be 'something more' [than foreseeability of effect] to demonstrate that the defendant directed his activity toward the forum state"). Furthermore, knowing the ERC drivers are manufactured in California does not lead to an assumption that plaintiff's principal place of business or headquarters are in California, or that the brunt of any alleged injuries caused by defendant's conduct would be felt by plain-

tiff in California, particularly because, as Callaway itself emphasizes, it is "engaged in design, manufacture, and sale of golf equipment and related products throughout the United States and other countries." Compl. at 2:2–4. *See Bancroft & Masters v. Augusta National*, 223 F.3d at 1088 (finding exercise of jurisdiction appropriate where defendant was "well aware" plaintiff company was based in, and conducted business "almost exclusively" in, the forum state).

In addition, the transcript of the relevant portions of the April 17, 2000 Rules Committee meeting makes no mention of Callaway's location, much less its location as a factor in the Rules Committee's decision, and plaintiff does not allege otherwise. Stone Decl. II, Ex. J.

As for Callaway's advertisement and press materials for use in *Golf Canada* magazine, such materials are sent to the RCGA, but go "directly to Golf Canada magazine." MacKenzie Decl. at ¶ 4. Defendant owns the magazine, but the magazine is published by an independent publisher not located at defendant's premises. DiMarcantonio Decl. at ¶ 17. Plaintiff offers no evidence to controvert defendant's contention that the press and advertising materials "would not have been seen by RCGA employees." DiMarcantonio Decl. at ¶ 17.

It is also shown that defendant sold its Glen Abbey Golf Course and pro shop in February 1999, over a year before the acts giving rise to plaintiff's claims occurred. DiMarcantonio Decl. at ¶ 8. None of the course's employees who might have received plaintiff's shipments in the shop have been employed by defendant since February 1999 or were ever involved with the decisions of defendant's Rules Committee or other executive decisions. *Id.*

Plaintiff's evidence does not establish that California has such a heavy concentration of golf manufacturers that defendant should be charged with knowing that the brunt of the effects of its actions would be felt by plaintiff in California. Opp'n 9 n. 9. In *Panavision v. Toeppen*, cited by plain-

tiff in support of its argument, the Ninth Circuit found that the defendant "likely" knew the plaintiff, a manufacturer of television and motion picture equipment, would feel the brunt of its injuries from the defendant's conduct in California because California was the plaintiff's principal place of business and "where the movie and television industry is centered." *Panavision v. Toeppen*, 141 F.3d at 1322.

Assuming plaintiff's facts are true, they do not give rise to a well-known geographical concentration of golf manufacturing akin to the television and movie industry, known throughout the world as centered in Hollywood. Plaintiff lists eight golf manufacturers "with [ ] headquarters or other significant operations in Southern California." McCracken Decl. at ¶ 4. However, five other "prominent" or "well-known" golf equipment manufacturers are not located in California, and of the "most prominent manufacturers of golf equipment" used in Canada, only two are headquartered in California. Stone Decl. II, Ex. C, 14:2–20, Ex. P.

If anything, plaintiff's evidence suggests that defendant knew or should have known that its decision would *not* affect sales of plaintiff's clubs in Canada or the U.S. The March 18, 2000 *Golf Week* article, which plaintiff asserts was the basis for the Rules Committee's decision, states that plaintiff had only planned to sell the ERC driver "in Japan and Europe, and [only in] very limited quantities," and that plaintiff's marketing of the driver was "filling a marketing need in Japan and Europe." Stone Decl. II, Ex. F at 67–8.

Callaway argues that although the RCGA's conduct may not affect sales of plaintiff's club in California, defendant's defamation and trade libel injures plaintiff's reputation in any market in which it operates, including California. Opp'n 16:1–8. Therefore, it argues, Callaway suffered injury in California, where it is headquartered. *Id.* (citing *California Software Incorporated v. Reliability Research, Inc.*, 631 F.Supp. 1356 (C.D.Cal.

1986)). This argument begs the question of whether defendant knew or should have known plaintiff would feel the brunt of the effects in California, because, as discussed above, foreseeability of some effects, without "something more," does not establish purposeful availment. In contrast, the defendants in *California Software* did not contest that they knew plaintiffs—one whose name was "*California* Software"—were located and did business in California. *California Software v. Reliability Research*, 631 F.Supp. at 1358. Furthermore, the *California Software* defendants knew the brunt of the effects of their conduct would be felt in California, because they intentionally made direct contact with Californians who had expressed an interest in conducting business with the plaintiffs for the express purpose of dissuading the residents from doing so. *Id.* at 1361–62.

In a footnote, plaintiff argues that under the "effects test," defendant purposely availed itself of California as a forum by sending the allegedly defamatory press release to five media outlets that it knew or should have known had a large circulation in California (*e.g.*, *USA Today*, *Golf Course News*, *Golf World*, *GolfWeek*, and the Golf Channel). Opp'n at 11 n. 11. Plaintiff does not allege or provide any evidence that any media outlet circulated or published the allegedly defamatory material in California. In *Casualty Assurance Risk Ins. Brokerage Co. v. Dillon*, the Ninth Circuit specifically rejected the exercise of specific jurisdiction, where, as here, a plaintiff does not allege or provide evidence of publication in the forum. *Casualty Assurance Risk Ins. Brokerage Co. v. Dillon*, 976 F.2d 596, 601 (9th Cir.1992). In *Casualty Assurance*, the Ninth Circuit found that in applying the "effects test" without any evidence or allegations that the defamatory material was circulated or published in the forum, the plaintiff was "urging this court to extend the 'effects' theory ... to encompass any jurisdiction where the plaintiff is present regardless of whether any defamation was circulated in that jurisdiction." *Id.* at 601. The court

found that exercise of specific jurisdiction without any allegation of publication in the forum "would undermine the notions of reasonableness, fair play, and substantial justice that are protected by the Due Process Clause." *Id.*

For these reasons, the Court does not find that the RCGA purposely availed itself of the protections and privileges of California by sending its April 18, 2000 press release to media outlets in the United States. Under the "effects test," plaintiff fails to establish a prima facie case that defendant knew or should have known that plaintiff would feel the brunt of defendant's action in California.

**2. Purposeful Availment Through Internet Web Site**

■ Plaintiff argues that a second, independent basis for finding defendant purposely availed itself of California's privileges and protections is defendant's maintenance of its interactive Web site through which users, including California residents, can purchase products from defendant.

■ The Ninth Circuit applies the "sliding scale" approach to jurisdiction arising from a defendant's Web site, an approach adopted by the district court in *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119, 1123 (W.D.Pa.1997). *See Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 419 (9th Cir.1997). Under the sliding scale approach, "the likelihood of personal jurisdiction [that] can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet." *Zippo Mfg. Co. v. Zippo Dot Com*, 952 F.Supp. at 1124. At one end of this sliding scale, the defendant conducts business transactions over the Internet with residents of the forum. *Id.* "In such situations, jurisdiction is almost always proper," because the defendant has asserted itself into the forum and made actual contact, often commercial, with a forum resident. *Millennium Enterprises v. Mil-*

*lennium Music,* 33 F.Supp.2d 907, 915 (D.Or.1999).

At the other end of the scale are "passive" Web sites, through which the defendant simply posts information to those who access the site, such as advertisements and informational pieces about the Web site host. *Id.* "A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise of personal jurisdiction." *Id.* at 916; *see also Cybersell v. Cybersell,* 130 F.3d at 419; *and see Zippo Mfg. Co. v. Zippo Dot Com,* 952 F.Supp. at 1124.

In the middle of the sliding scale are "interactive" Web sites that allow the user to exchange information with the defendant host site. *Zippo Mfg. Co. v. Zippo Dot Com,* 952 F.Supp. at 1124. In these cases, courts must examine "the level of interactivity and commercial nature of the exchange of information that occurs on the Web site" to determine if the defendant has purposely availed itself of the forum to make the exercise of jurisdiction comport with traditional notions of fair play and substantial justice. *Cybersell v. Cybersell,* 130 F.3d at 420 (citing *Zippo Mfg. Co. v. Zippo Dot Com,* 952 F.Supp. at 1124).

In *Cybersell,* the Ninth Circuit declined to exercise personal jurisdiction over a defendant whose Web site was passive. *Cybersell v. Cybersell,* 130 F.3d at 419–20. The site at issue in *Cybersell* did nothing to encourage people in the forum state to access the site, although it allowed users to list their addresses with the site, indicate an interest in the defendant's services, and view advertisements and other information posted on the site. It also posted a telephone number where users could call the defendant host company. *Id.* The defendant in *Cybersell* conducted no commercial activity over the site and consummated no other transactions, and thus "performed [no] act by which it purposely availed itself of the privilege of conducting activities in [the forum state]." *Id.* at 419.

Defendant's Web site has many of the features the Ninth Circuit described as "passive" or not sufficiently interactive to warrant personal jurisdiction in *Cybersell.* Defendant's Web site allows users to view press releases and information about Canadian golfers, the development of the game of golf in Canada, RCGA decisions, and RCGA-sponsored seminars. Ross Decl. at ¶¶ 24, 26. Users can also sign a "Guestbook" which allows them to post questions to the RCGA, to which the staff posts responsive answers. Ross Decl. at ¶ 22. However, unlike the *Cybersell* Web site, defendant can and does conduct commercial activity by allowing users to purchase tickets to RCGA-sponsored golf tournaments, copies of the Rules of Golf, and other products. *Id.* at ¶ 23; Stone Decl. I, Ex. B–4, B–5. In 1998, two persons listing California addresses purchased tickets through the Web site. Ross Decl. at ¶ 23. At least two persons listing California addresses have purchased the Rules of Golf through defendant's site, albeit one of those purchases was by the husband of a legal assistant of Callaway's attorneys. Leahy Decl. at ¶ 3.

Defendant's commercial activity on its Web site constitutes a small portion of its revenue—no more than 0.11% of RCGA's gross sales. Ross Decl. at ¶ 20. However, "the critical inquiry in determining whether there was a purposeful availment of the forum state is the quality, nor merely the quantity, of the contacts." *Stomp, Inc. v. NeatO LLC,* 61 F.Supp.2d 1074, 1078 (C.D.Cal.1999) (holding that "by advertising and offering its products for sale via the Internet," the defendant purposely availed itself of the forum state, even though only two sales had been consummated with forum residents, both of which were to plaintiff's president and his friend after the motion to dismiss the complaint had been made); *see also Park Inns International v. Pacific Plaza Hotels,* 5 F.Supp.2d 762, 763 (D.Ariz.1998) (finding purposeful availment is shown if the defendant transacted business with residents of the forum through the defendant's Web site); *but see S. Morantz, Inc. v. Hang & Shine Ultrasonics, Inc.,* 79 F.Supp.2d 537,

542–43 (E.D.Pa.1999) (finding defendant's commercial sale of only five products to forum residents via its Web site to be "the kind of fortuitous, random, and attenuated contacts that the Supreme Court has held insufficient to warrant the exercise of jurisdiction") (internal quotations omitted).

Simply by maintaining a Web site accessible to California users and including information on the site such as the April 18, 2000 press release, the RCGA has not purposely availed itself of this forum. The press release in particular is analogous to the advertisements found to be too "passive" to constitute purposeful availment in *Cybersell.*

Even if defendant RCGA has purposely availed itself of the privileges and protections of California by offering products for sale on-line and consummating commercial transactions via its Web site, this Court cannot properly exercise jurisdiction over defendant. As explained below, plaintiff's claims do not arise from that on-line commercial activity, as required for a federal court to exercise specific jurisdiction.

### B. "Arising Out Of" Forum–Related Activities

■ For a court properly to exercise specific personal jurisdiction, "the contacts constituting purposeful availment must be the ones that give rise to the current suit." *Bancroft & Masters v. Augusta National,* 223 F.3d at 1088; *see also Ballard v. Savage,* 65 F.3d at 1498 (declining to consider certain of the defendant's contacts with the forum state for specific jurisdiction purposes because plaintiff's case against the defendant did not concern those contacts); *and see American Network, Inc. v. Access America/Connect Atlanta, Inc.,* 975 F.Supp. 494, 499 (S.D.N.Y. 1997) (declining to exercise specific jurisdiction based on mere existence of interactive Web site, but exercising jurisdiction because plaintiff's claims related to contracts defendant entered into with plaintiff through the Web site). In effect, this requirement is met if, "but for" a defendant's forum-related activities through which a defendant purposely avails itself

of the forum, the plaintiff would not have suffered injury. *Ballard v. Savage,* 65 F.3d at 1500.

■ Plaintiff does not meet this but-for requirement. The RCGA may be said to have purposely availed itself of California as a forum by engaging in limited commercial activity through its Web site, as its Web site was accessible to, and used by, California residents. However, these contacts have no relationship to plaintiff's claims against defendant. Put another way, it cannot be said that "but-for" defendant's commercial activity on its Web site, plaintiff would not have suffered the injuries defendant allegedly caused. Plaintiff's claims do not arise from any forum-related activities through which defendant purposely availed itself of California as a forum. The Central District of California cannot, therefore, exercise jurisdiction over the RCGA.

### C. Reasonableness of Exercising Jurisdiction

■ Even if the Court concluded that defendant purposely availed itself of California's benefits and protections, and that plaintiff's claims would not have arisen but for defendant's acts constituting purposeful availment, the exercise of jurisdiction over defendant in California would be unreasonable.

■ The assertion of personal jurisdiction must comport with "traditional notions of fair play and substantial justice." *International Shoe v. Washington,* 326 U.S. at 316, 66 S.Ct. 154 (internal quotes omitted). The Court must presume that an otherwise valid exercise of specific jurisdiction is reasonable, and a defendant challenging jurisdiction has the burden of convincing the Court otherwise. *See Ballard v. Savage,* 65 F.3d at 1500 ("To avoid jurisdiction, [the defendant] must 'present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'") (quoting

*Burger King Corp. v. Rudzewicz,* 471 U.S. at 477, 105 S.Ct. 2174).

The Ninth Circuit has articulated seven factors to determine whether the exercise of jurisdiction over a non-resident defendant comports with fair play and substantial justice, none of which is dispositive, but all of which the Court must consider:

(1) the extent of the [defendant's] purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the [defendant's] state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*See Core–Vent Corp. v. Nobel Indus.,* 11 F.3d at 1487–88. As explained below, these factors weigh against exercising jurisdiction over defendant.

### 1. Purposeful Interjection

A district court must consider the extent to which the defendant, by its alleged activities, purposefully interjected itself into the forum. *Core–Vent Corp. v. Nobel Indus.,* 11 F.3d at 1488. Assuming defendant's sales to California residents are sufficient to meet the "purposeful availment" test analyzed above, the extent of interjection into the forum state is a separate factor for assessing reasonableness. *See Id.* (suggesting that "a greater volume of additional connections is required to justify the exercise of jurisdiction when weighing reasonableness factors") (internal citation omitted). The "smaller the element of purposeful interjection, the less is jurisdiction to be anticipated and the less reasonable is its exercise." *Ins. Co. of North America v. Marina Salina Cruz,* 649 F.2d 1266, 1271 (9th Cir.1981).

Here, defendant's contacts with California are so attenuated that the "purposeful interjection" factor weighs heavily in its favor. For example, plaintiff does not dis-

pute that neither defendant's Web site nor defendant's programs and products are targeted to Californians. The content and distribution of the press release at issue also have no features indicating defendant's intentional appeal to Californians in particular. Defendant does not sponsor events in California, and no RCGA personnel have visited California on official business. Mot. at 6:24–27. In short, defendant has not interjected itself into California.

### 2. Defendant's Burden of Litigating in California

In a reasonableness analysis, the Court must also consider the burden that litigating in the forum places on the non-resident defendant. The "unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. at 114, 107 S.Ct. 1026. "Though the burden of litigating [an] action [against a Canadian organization] in California would not be insurmountable ... it would nonetheless be substantial." *Rocke v. Canadian Auto. Sport Club,* 660 F.2d 395, 399 (9th Cir.1981). In *Rocke v. Canadian Auto. Sport Club,* the court found that "[although] modern transportation had indeed reduced some of the burden of litigation in a faraway forum," the Canadian defendant organizations "nonetheless face a significantly greater burden defending [an] action in California than in [Canada]," particularly where the alleged acts giving rise to the claim occurred in Canada and most of the discovery would be centered in Canada. *Id.; see also OMI Holdings v. Royal Ins. Co. of Canada,* 149 F.3d 1086, 1096 (10th Cir.1998) (finding Canadian corporations' burden of litigating in Kansas "significant" where the corporations "have no license to conduct business in Kansas, maintain no offices in Kansas, [and] employ no agents in Kansas").

Here, the defendant's burden of litigating in California is likewise great. The members of the Rules Committee, likely witnesses in this case, are all located in Canada, as are other employee witnesses to defendant's conduct at issue. Mot. at 21:22–23. Like the defendants in *OMI Holdings,* defendant here employs no agents in California and has no offices or license to conduct business in California.

Although a plaintiff's inconvenience of litigating claims in an alternative forum generally weighs against the defendant's burden, here the inconvenience to plaintiff from litigating in Canada does not tip this factor significantly in plaintiff's favor. *See Sinatra v. National Enquirer,* 854 F.2d 1191, 1199 (9th Cir.1988) (finding that the "burden on the defendant must be examined in light of the corresponding burden on the plaintiff"). Whereas the "bulk" of plaintiff's records, exhibits and other evidence may be located in California (Opp'n at 19:5–6), the greater burden of moving people falls on defendant, whose employee witnesses are located in Canada, including the Rules Committee members who made the critical decision at issue in this litigation. Mot. at 23:24–25.

Furthermore, defendant is a non-profit organization whose excess annual revenues are earmarked for the RCGA's mandated purpose; the development of the game of golf in Canada. DiMarcantonio Decl. at ¶ 4. If this Court were to exercise jurisdiction, defendant would be required to divert those resources to defending itself in a foreign country beyond the geographical boundaries of its organizational mission. On the other hand, plaintiff is "the most successful manufacturer and seller of golf equipment in the world" (Compl. at 3:9–10) whose 1999 overall gross profits were $338,066,000 (Stone. Decl. II, Ex. N at 4:22–24). Defendant will experience a greater relative financial burden from defending in California than plaintiff will experience by litigating in Canada. *See Karsten Mfg. Corp. v. United States Golf Ass'n,* 728 F.Supp. 1429, 1435 (D.Ariz. 1990) (noting in its analysis of the burden factor that non-resident defendant was an unincorporated non-profit organization and plaintiff a profitable corporate resident of the Arizona).

In short, the burden of defending in this forum is a factor that weighs strongly in defendant's favor.

### 3. Sovereignty Interests

The Court also must weigh the extent to which the exercise of jurisdiction by a federal court in California would conflict with the sovereignty interests of the alternative forum. *See Panavision v. Toeppen,* 141 F.3d at 1323. "Where the defendant is a resident of a foreign nation rather than a resident of another state within our federal system, the sovereignty barrier is 'higher.'" *Rocke v. Canadian Auto. Sport Club,* 660 F.2d at 399. The U.S. Supreme Court has cautioned that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. at 115, 107 S.Ct. 1026 (citation omitted). The Ninth Circuit has likewise given great weight to this factor in cases where the defendant is a resident of a foreign country. *See Core–Vent Corp. v. Nobel Indus.,* 11 F.3d at 1489 ("The foreign-acts-with-forum-effects jurisdictional principle must be applied with caution, particularly in an international context.") (citing *Pacific Atlantic Trading Co. v. M/V Main Exp.,* 758 F.2d 1325, 1330 (9th Cir.1985)).

The fact that defendant is "unquestionably [a] resident [ ] of Canada ... tends to undermine the reasonableness of personal jurisdiction in this case," particularly because defendant has a corporate charter by the Canadian government to administer Canadian rules of men's amateur golf in Canada. *Rocke v. Canadian Auto. Sport Club,* 660 F.2d at 399. As such, exercising personal jurisdiction in California would affect the policy interests of Canada. *See OMI Holdings v. Royal Ins. Co. of Canada,* 149 F.3d at 1098 (finding exercise of personal jurisdiction in Kansas over Canadian defendant corporations "would affect

the policy interests of Canada [because] Defendants are Canadian corporations"). Furthermore, defendant has no operations or agents, subsidiaries, officers, or other representatives based in the United States. "Sovereignty concerns weigh more heavily when defendants have no United States-based relationships." *Core–Vent Corp. v. Nobel Indus.*, 11 F.3d at 1489. The sovereignty factor, therefore, weighs strongly in defendant's favor.

### 4. State's Interest

The Court must consider California's interest in adjudicating the suit in California. *Core–Vent Corp. v. Nobel Indus.*, 11 F.3d at 1489. "California maintains a strong interest in providing an effective means of redress for its residents [who are] tortiously injured." *Id.* (internal citations omitted). However, California has little interest in regulating the policy-making decisions behind rules administered by a Canadian organization in Canada and applicable only to the game of golf in Canada. *See, e.g., Rocke v. Canadian Auto. Sport Club*, 660 F.2d at 399 (concluding that although "the economic impact [of the Canadian defendants' actions] will certainly be felt in California ... California's interest is diluted somewhat because is has no reasonable interest otherwise in regulating the conduct of [Canadian sports clubs]"). This factor also weighs in defendant's favor.

### 5. Efficiency of the Forum

The Court must also consider the efficiency of California as the forum for litigating this dispute, primarily noting where the witnesses and evidence are likely to be located. *See Core–Vent Corp. v. Nobel Indus.*, 11 F.3d at 1489.

Plaintiff asserts that at trial, it "will present experts, records, exhibits and other evidence, the bulk of which are located in California," and that "even the RCGA's experts will probably come from [California]." Opp'n at 19:4–8. Defendant argues that "[a]ll RCGA employees are located in Canada. Evidence concerning the promulgation of RCGA's decision regarding the

ERC driver would be located at the RCGA headquarters in Ontario." Mot. at 25:25–27. Although this factor does not substantially weigh in either partys' favor, the presence of all defendant's employee witnesses, including the members of the Rules Committee, in Canada tips this factor slightly in favor of defendant.

### 6. Convenience and Availability of an Alternate Forum

Finally, the Court must consider two related factors: whether an alternate forum exists and the convenience and effectiveness of relief for the plaintiff in that alternative forum. *See Core–Vent Corp. v. Nobel Indus.*, 11 F.3d at 1490. The plaintiff bears the burden of proving the unavailability of an alternative forum. *See Id.*

Here, plaintiff argues that an alternative forum in Canada is not available because plaintiff would not be entitled to a jury trial, discovery in Canada is "extremely limited," and plaintiff's counsel of choice is not licensed to practice law in Canada. Opp'n at 19:16–20, 20:10–13. Plaintiff also speculates that *if* it later decides to seek relief for defendant's "anti-competitive conduct," "to the extent third parties such as the USGA *may* have evidence relevant to [that issue], that evidence would be put completely beyond Callaway Golf's reach is this case were to be tried in Canada." *Id.* at 7–9 (italics added). However, these procedural and speculative concerns do not show that Canada is unable to provide a remedy to plaintiff. Plaintiff does not attempt to establish that Canadian law fails to recognize plaintiff's existing claims against defendant. And, plaintiff does not begin to show that while unfortunate, the loss of its chosen counsel defeats its claims. Plaintiff, therefore, does not meet its burden of proving unavailability of an alternative forum.

Regarding convenience, "no doctorate in astrophysics is required to deduce that trying a case where one lives is almost always a plaintiff's preference." *Roth v. Garcia Marquez*, 942 F.2d 617, 624 (9th Cir.1991). In the instant case, a California

forum is clearly more convenient for plaintiff. However, the Court is mindful that this factor carries little weight in the overall jurisdictional analysis. *See Core–Vent Corp. v. Nobel Indus.*, 11 F.3d at 1490.

On balance, these factors weigh against the exercise of personal jurisdiction. Requiring defendant to litigate this dispute in California would be unreasonable and would not comport with traditional notions of fair play and substantial justice.

### D. General Jurisdiction

In its opposition brief, plaintiff finds any discussion of general jurisdiction unnecessary, because "RCGA is clearly subject to specific jurisdiction." Opp'n at 8 n. 8. Given the difficulties in plaintiff's assertion of specific jurisdiction, a brief explanation of the unavailability of general jurisdiction may be warranted.

General jurisdiction exists for a non-resident defendant whose forum-related activities are "substantial," or "continuous and systematic." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413–14, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Defendant's contacts with California are not continuous, systematic, or substantial enough to justify general jurisdiction. Defendant has never been registered to conduct business in California, nor has defendant had an office, property or bank account in California. Mot. at 6:21–25. Defendant does not sponsor events in California, and no RCGA personnel have visited California on official business. *Id.* at 6:24–27. On only one occasion, in 1998, has an individual with a California address purchased tournament tickets from defendant through its Web site, paying $70.00, which represents 0.000304% of defendant's total revenue. Mot. at 3:5–11; Ross Decl. at ¶ 24. Only two individuals listing California addresses have purchased copies of the Rules of Golf through defendant's Web site for a total value of $7.50, or 0.0000326% of defendant's total revenue. Mot. at 3:11–5; Ross Decl. at ¶ 24. No individuals listing California address have ever registered for or attended a RCGA seminar via the Web site or participated in the "Guestbook" feature of the Web site. Mot. at 2:25–27, 3:15–8; Ross Decl. at ¶¶ 22, 24.

Defendant's contacts with California are not continuous, systematic, or substantial, but are intermittent and minor in relation to defendant's revenues, events, and mission. This Court cannot constitutionally exercise general jurisdiction over the RCGA.

### V.

### *CONCLUSION*

The Court finds that plaintiff has not established a prima facie case of personal jurisdiction over defendant. Accordingly, the action is dismissed without prejudice.

IT IS SO ORDERED.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Order on counsel for all parties in this action.

# APPENDIX A

## April 18, 2000  RCGA  Press Release

ABOUT RCGA I GOLF CANADA I MEMBERSHIP I HANDICAPPING I GREEN SECTION I RULES OF GOLF I HALL OF FA
PLAYER DEVELOPMENT I FUTURE LINKS I AMATEUR CHAMPIONSHIPS I AT&T CANADA SENIOR OPEN I BELL CANADIAN OF

CURRENT RELEASES
ARCHIVED RELEASES

CONTACT LIST
NEWS RELEASES
JOIN E-MAIL LIST
FAQ
ASK A QUESTION
SEARCH/LINKS
ORDER RCGA PRODUCT

### RCGA BACKS USGA'S DECISION ON BANNING CALLAWAY ERC DRIVERS

--RCGA NEWS RELEASE-- FOR IMMEDIATE RELEASE: Tuesday, April 18, 2000

Oakville, Ont. -- The Royal Canadian Golf Association support the United States Golf Association's decision to classify the Callaway ERC driver as a non-conforming club for all RCGA-sanctioned events, the association announced today.
Although the Callaway ERC driver is recognized as conforming by all countries under the jurisdiction of the Royal & Ancient Golf Club of St. Andrews, the rules committee of the RCGA declined to follow that direction during a committee meeting on Tuesday, as the club does not conform to the USGA's velocity test.

"The rules committee acknowledges the R&A's choice to allow the Callaway ERC driver and traditionally, we would abide by their decision. But we perceive this situation as a North American issue," says Jim Fraser, managing director of rules and amateur competitions for the RCGA. "Many Canadian players participate in USGA and American Junior Golf Association events and it is in our best interest to prohibit the club's use at RCGA events to eliminate future discrepancies at international competitions."

Callaway's new ERC driver is a thin-faced club that has a spring-like effect upon impact with the ball, which leads to greater distance.

The RCGA rules committee also agreed to use the USGA technical facilities to test any club that is submitted to the associations, in accordance with Rule 4 in the RCGA Rules of Golf.

Information about all RCGA events and programs can be found at www.rcga.org on the Internet.

EXHIBIT
15

FOR FURTHER INFORMATION:
Chad Schella

EXHIBIT E-115
9-20 00

Manager, Communications
Office: 905-849-9700, ext. 227
Cellular: 416-573-7527
Fax: 905-845-7040
E-mail: media@rcga.org

EXHIBIT F-119

-RCGA NEWS RELEASE- FOR IMMEDIATE RELEASE: 18/04/2000

# RCGA BACKS USGA'S DECISION ON BANNING CALLAWAY ERC DRIVERS

*Oakville, Ont.* -- The Royal Canadian Golf Association support the United States Golf Association's decision to classify the Callaway ERC driver as a non-conforming club for all RCGA-sanctioned events, the association announced today.

Although the Callaway ERC driver is recognized as conforming by all countries under the jurisdiction of the Royal & Ancient Golf Club of St. Andrews, the rules committee of the RCGA declined to follow that direction during a committee meeting on Tuesday, as the club does not conform to the USGA's velocity test.

"The rules committee acknowledges the R&A's choice to allow the Callaway ERC driver and traditionally, we would abide by their decision. But we perceive this situation as a North American issue," says Jim Fraser, managing director of rules and amateur competitions for the RCGA. "Many Canadian players participate in USGA and American Junior Golf Association events and it is in our best interest to prohibit the club's use at RCGA events to eliminate future discrepancies at international competitions."

Callaway's new ERC driver is a thin-faced club that has a spring-like effect upon impact with the ball, which leads to greater distance.

The RCGA rules committee also agreed to use the USGA technical facilities to test any club that is submitted to the associations, in accordance with Rule 4 in the RCGA Rules of Golf.

Information about all RCGA events and programs can be found at www.rcga.org on the Internet.

FOR FURTHER INFORMATION:
Joe Romagnolo
Manager, RCGA Communications
Phone: 905-849-9700, ext. 227
E-mail: roma@rcga.org

*Royal Canadian Golf Association*

1212

# APPENDIX B
## May 5, 2000  RCGA  Press Release

ABOUT RCGA I GOLF CANADA I MEMBERSHIP I HANDICAPPING I GREEN SECTION I RULES OF GOLF I HALL OF FA.
PLAYER DEVELOPMENT I FUTURE LINKS I AMATEUR CHAMPIONSHIPS I AT&T CANADA SENIOR OPEN I BELL CANADIAN OF

CURRENT RELEASES
ARCHIVED RELEASES

## RCGA ISSUES USGA'S LIST OF NON-CONFORMING DRIVERS

--RCGA NEWS RELEASE-- FOR IMMEDIATE RELEASE: Friday, May 05, 2000

Oakville, Ont. -- The Royal Canadian Golf Association has banned 11 drivers from competition that exceed the United States Golf Association's limitations for spring-like effect upon impact with the ball, which leads to greater distance.

ORDER RCGA PRODUCT

Included on the list is the Callaway ERC driver, as was announced last week by the RCGA's Rules Committee, supporting the USGA's decision to classify it as a non-conforming club.

Following is a complete list of all drivers that will be listed as non-conforming at RCGA-sanctioned events:

Callaway ERC Driver (11 degree)

Impact Golf Technologies Carrera II Turbo (10.5 degree)

Impact Golf Technologies Carrera II Turbo (10.5 degree prototype)

Daiwa G3 901 Ti-01 (12 degree)

Daiwa G3 Hyper Titan (10.5 degree)

Daiwa G3 Hyper Titan (12 degree)

Daiwa G3 902 Ti-01 (12 degree)

Yokohoma Rubber Co. Reverse Titanium Type 310 (9 degree)

Maruman Majesty Power Head (12 degree)

Maruman Dreadnaught Model 402 (10 degree)

Bridgestone Break The Mode Joe Special (10 degree)

**EXHIBIT**
**18**

Information about all RCGA events and programs can be found at www.rcga.org on the Internet.

EXHIBIT F - 12?
9 20 00

■■■■■■■■■■■■■■■■■■■■■■■■ 1213

**FOR FURTHER INFORMATION:**
Chad Schella
Manager, Communications
Office: 905-849-9700, ext. 227
Cellular: 416-573-7527
Fax: 905-845-7040
E-mail: media@rcga.org

EXHIBIT F-121

--RCGA NEWS RELEASE-- FOR IMMEDIATE RELEASE: 05/05/2000

# RCGA ISSUES USGA'S LIST OF NON-CONFORMING DRIVERS

*Oakville, Ont.* -- The Royal Canadian Golf Association has banned 11 drivers from competition that exceed the United States Golf Association's limitations for spring-like effect upon impact with the ball, which leads to greater distance.

Included on the list is the Callaway ERC driver, as was announced last week by the RCGA's Rules Committee, supporting the USGA's decision to classify it as a non-conforming club.

Following is a complete list of all drivers that will be listed as non-conforming at RCGA-sanctioned events:

Callaway ERC Driver (11 degree)

Impact Golf Technologies Carrera II Turbo (10.5 degree)

Impact Golf Technologies Carrera II Turbo (10.5 degree prototype)

Daiwa G3 901 Ti-01 (12 degree)

Daiwa G3 Hyper Titan (10.5 degree)

Daiwa G3 Hyper Titan (12 degree)

Daiwa G3 902 Ti-01 (12 degree)

Yokohoma Rubber Co. Reverse Titanium Type 310 (9 degree)

Maruman Majesty Power Head (12 degree)

Maruman Dreadnaught Model 402 (10 degree)

Bridgestone Break The Mode Joe Special (10 degree)

Information about all RCGA events and programs can be found at www.rcga.org on the Internet.

FOR FURTHER INFORMATION:
Joe Romagnolo
Manager, RCGA Communications
Phone: 905-849-9700, ext. 227
E-mail: roma@rcga.org

*Royal Canadian Golf Association*