Kevin SPACEY, an individual, and M. Profitt Productions, Inc., a California Corporation, Plaintiffs,

v.

Jeffrey BURGAR, an individual, and the Kevin Spacey Club, Defendants.

No. 01CV3848.

United States District Court, C.D. California.

Nov. 15, 2001.

Order Denying Reconsideration May 16, 2002.

Seth A. Gold, Manatt Phelps & Phillips, Los Angeles, CA, Susan Elaine Hollander, Jennifer S. Fryhling, Manatt Phelps & Phillips, Palo Alto, CA, for plaintiffs.

Jeff Call Katofsky, Jeff Katofsky Law Offices, Los Angeles, CA, Eric Christopher Grimm, Ann Arbor, MI, for defendants.

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

FEESS, District Judge.

## I.

### INTRODUCTION

The present case presents complex issues involving the right of a celebrity to bring suit in United States District Court for the alleged misappropriation of his name by a foreign internet website operator. However, in this order, the Court does not reach these issues because Defendants raise a novel threshold question regarding the exercise of personal jurisdiction where the Defendants' "contacts" with the forum have occurred in cyberspace. The Court therefore takes up that issue first.

Kevin Spacey, the well-known movie actor, claims Defendant Jeffrey Burgar mis-

appropriated Spacey's name by registering and using the internet website address "kevinspacey.com" without Spacey's authorization. Responding that he needn't obtain authorization, Burgar admits to having registered the address, and to having used the address from 1996 to the present. The undisputed facts establish that from 1996 to about December 2000, those who attempted to access "kevinspacey.com" were routed to Burgar's "Celebrity 1000" website; since then, those typing "kevinspacey.com" into their web browsers have been directed to the "Unofficial Kevin Spacey Website," also operated by Burgar through one of his companies. According to Spacey, Burgar's unauthorized use of Spacey's name in an internet address falsely implies Spacey's endorsement of Burgar's websites, which causes a likelihood of confusion on the part of the public resulting in harm to Spacey's reputation and goodwill. In the pending complaint, Spacey sets forth several claims against Burgar and Kevin Spacey Club (a dba for one of Burgar's corporations), which assert Spacey's intellectual property rights under federal and state statutes, and common law doctrines.

Burgar and Defendant Kevin Spacey Club, now move to dismiss the case under Rule 12(b)(2) of the Federal Rules of Civil Procedure, claiming that this Court lacks personal jurisdiction over him and his company. Burgar contends that he has never purposefully availed himself of the privilege of doing business in California, and that his actions in operating his website were not directed at and caused no "effects" in California. Because such minimum contacts are allegedly missing, Burgar argues that the Court's exercise of jurisdiction in this case would violate the Due Process Clause of the Constitution. Spacey disagrees. He contends that Burgar's website focuses on the entertainment industry, much of which is located in the Los Angeles area, where Spacey spends a substantial amount of time working as a movie actor. Because of his involvement in and connection to the entertainment industry, Spacey argues that Burgar knew or should have known that the harm resulting from the unauthorized use of Spacey's name would occur in California. Finally, Spacey contends that Burgar has purposefully availed himself of the privilege of doing business in California by including "banner ads" on his website that focus on the Los Angeles and Orange County areas. For all of these reasons, Spacey argues that the Court's exercise of personal jurisdiction in this case would comply with the due process requirements of the United States Constitution.

Having read and considered the moving, opposition and reply papers, the authorities cited therein, the supporting affidavits submitted by each of the parties, and the argument of the parties at the hearing on the present motion, the Court concludes that the Due Process Clause of the Constitution precludes the exercise of personal jurisdiction over both nonresident Defendants in the instant action. Although Burgar's website contains information about the entertainment industry and those who work in it, the site is no more aimed at California than at the remaining 49 states, where avid fans seek information regarding their favorite celebrities. The Ninth Circuit's decision in *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 419–20 (9th Cir.1997) teaches that, without more, the use of an allegedly misappropriated domain name, in connection with a website generally accessible to anyone on the internet, will not support the exercise of personal jurisdiction in the name owner's state of residence. The "something more" is not present in this case, in which the evidence negates any claim that Burgar attempted to sell the domain name to Plaintiffs and fails to establish that Burgar engaged in any significant business with California persons or companies. Accord-

ingly, the Court concludes that Defendants' motion should be **GRANTED**.

## II.

## STATEMENT OF FACTS

### A. *Spacey's Residence and Occupation*

Plaintiff Kevin Spacey, whose primary residence is in New York, is a well-known professional actor who has performed in a number of successful motion pictures. (Spacey Decl. ¶¶ 1 and 2; Lee Decl. Ex. N). Spacey claims to have been a California resident in 1999 and 2000, and for approximately half of 1998. (Spacey Decl. ¶ 3). Spacey owns a California corporation, M. Proffit Productions, Inc., which negotiates with movie production companies for his services. As Spacey puts it, "In other words, M. Profitt is the entity that enters into a contract with the producer of a particular film to provide my personal acting services on productions." (Spacey Decl. ¶ 4). M. Profitt maintains offices on Wilshire Boulevard in the Westwood Village area of Los Angeles.

### B. *Burgar's Corporation Registers "Kevinspacey.com"*

Defendant Jeffrey Burgar resides in Alberta, Canada, where he is the President and principal shareholder of Defendant 641271 Alberta, Ltd., d/b/a Kevin Spacey Club (referenced herein as "Kevin Spacey Club"), a corporation formed and headquartered in Alberta, Canada. (Burgar Aff. ¶¶ 5 and 7; Burgar Supp. Decl. ¶ 6). On November 6, 1996, Kevin Spacey Club registered the internet domain name "kevinspacey.com" and has owned the domain name since that date. (Burgar Aff. ¶ 7). Burgar caused the name to be registered through Network Solutions, Inc., a Virginia corporation, which has since been acquired by Verisign, Inc. (Burgar Aff. ¶ 14; Burgar Supp. Decl. ¶¶ 17–18).[1] Recently, Kevin Spacey Club changed the registrar/service provider for kevinspacey.com to Mediafusion, a company headquartered in Montreal, Canada. (Burgar Aff. ¶¶ 14 and 41; Burgar Supp. Decl. ¶¶ 17–18).

### C. *Burgar Licenses "Kevinspacey.com" to a Second Corporation*

Once having registered the domain name, Burgar caused Kevin Spacey Club to enter into a licensing agreement with another of his companies, 831651 Alberta, Ltd., d/b/a Celebrity 1000 (referenced herein as "Celebrity 1000"), under which Kevin Spacey Club authorized Celebrity 1000 to use kevinspacey.com for addressing purposes in its publication of website materials. (Burgar Aff. ¶ 8; Burgar Supp. Decl. ¶ 4). This agreement allowed Celebrity 1000 to divert those attempting to access kevinspacey.com to its address at "celebrity1000.com." (Fryhling Decl. ¶¶ 2–4 and Ex. K). Under this agreement, Celebrity 1000 diverted "hits" on "kevinspacey.com" to "celebrity1000.com" from 1996 to about December 2000. Beginning in December of 2000, Celebrity 1000 began publishing the "Unofficial Kevin Spacey Website" at the address kevinspacey.com, which is published "under the Celebrity 1000 umbrella ... consistent with the schedule of creating individual celebrity biographical pages." (Burgar Supp. Decl. ¶ 48). The unofficial website contains a photograph of Spacey and a brief biographical sketch.

### D. *The Operation of the Websites*

As noted, Burgar resides in Alberta, Canada, which is also the location of the

---

**1.** Kevin Spacy Club is also the present owner of a number of other internet domain names. (Burgar Aff. ¶ 13). Approximately 40 of these other Domain Names comprise the first and last names of persons, which Mr. Burger states are to be used for the publication of fan appreciation websites. (*Id*).

host computers for the Celebrity 1000 web page. (Burgar Aff. ¶ 40; Burgar Supp. Decl. ¶ 34). Thus, when one types the address "celebrity1000.com" into his or her web browser, the browser accesses computer files that reside on a server located in Alberta, Canada, and brings up the Celebrity 1000 "home page." (*Id*).

The Celebrity 1000 Website focuses on entertainment industry news, offers on-line fan participation polls and other celebrity-related content, and also contains various kinds of advertising. (Burgar Aff. ¶ 21). When one accesses Celebrity 1000, the "home page" provides links to various categories under the heading "Celebrity Guide," which lists the following: "Celebrity Sites," "Entertainment News," "Online Polls," "Merchandise," and "Contact Us." The site routes a visitor who clicks on "Celebrity Guide" to a page that lists celebrity sites by category, including "Actor." A click on the word "actor" routes the visitor to another page that contains links to further pages designated by the actor's name. Thus, if one wished to obtain further information about Kevin Spacey, one would go to the actor link page and click on Spacey's name. A new page then appears, containing biographical data regarding Spacey. (Gold Decl. ¶¶ 5–7 and Exs. B and C). The Celebrity 1000 Website's homepage also contains a disclaimer which states:

> "Information on this site is for information purposes only. Nothing on this site is to be construed as an endorsement by any celebrity or personality, unless expressly so identified, for this site or for any information here."

(Burgar Aff. ¶ 39).

On at least some occasions, the website included so-called "banner" advertisements and hyperlinks to entertainment guides focusing on the Southern California area. One such advertisement acts as a hyperlink that connects the browser to a subscription page for "LAinsider.com," an internet guide to dining establishments, and entertainment and cultural events in the Los Angeles area. (Gold Decl. ¶¶ 10–12 and Exs. D—G). On occasion, the Celebrity 1000 website contained a similar banner advertisement touting "ocnow.com," an internet service similar to LAinsider.com, which serves as an entertainment guide for the Orange County region of Southern California. (Gold Decl. ¶¶ 13–14 and Exs. H and J). No one can reasonably dispute that such banner ads appeared on the Celebrity 1000 website, or that those ads were directed at residents of Southern California. However, because of the complexities of internet advertising, that observation is not the end of the inquiry.

Burgar notes that he did not place those entertainment guide advertisements on his website. Rather, he presents evidence, in the form of his declaration, that Celebrity 1000 first contracted with VBN, a Canadian internet advertising placement agency, for the placement of banner ads on the Celebrity 1000 website. (Burgar Supp. Decl. ¶ 32). According to Burgar, VBN bought ad space on the website for a fee, after which VBN was free to market the space to any advertiser who was interested in buying the space. Also according to Burgar, VBN entered into contracts with advertisers, but Celebrity 1000 entered into a contractual relationship only with VBN, and never had a direct contractual relationship with any of the advertisers who bought space on the site. (*Id*).

Though the host computers for the files that constitute the "LAinsider.com" and "ocnow.com" web pages have not been definitively identified, those files do not reside on Defendants' computers.[2] When

**2.** These two entertainment cites are apparently related to one another. The LAinsider.com

one accesses the Celebrity 1000 site and clicks on the banner advertisement, the visitor's browser retrieves data from another server, in this case, according to Burgar, VBN's servers in Toronto, Canada. (Burgar Supp. Decl. ¶¶ 34–35, 45 and 49).[3]

### E. SPACEY'S DEMAND FOR REASSIGNMENT OF "KEVINSPACEY.COM"

In September 2000, Plaintiffs wrote Mr. Burgar requesting the assignment of kevinspacey.com. (Compl.Ex. F). Defendants chose not to respond and remain unwilling to sell the domain name. (Compl. Ex. F; Burgar Aff. ¶¶ 9 and 38; Burgar Supp. Decl. ¶ 14).

### III.

### ANALYSIS

### A. STANDARD FOR RULE 12(b)(2) MOTION TO DISMISS

In a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of proof with respect to the relevant jurisdictional facts where the court holds an evidentiary hearing on the motion. *Ballard v. Savage*, 65 F.3d 1495, 1497 (9th Cir.1995). If no hearing is conducted and the court makes no findings of fact, a plaintiff satisfies this burden by alleging facts that, if true, would support an exercise of jurisdiction over the defendant. *Ballard v. Savage*, 65 F.3d at 1498; *Data Disc, Inc. v. Systems Tech. Assocs., Inc.*, 557 F.2d 1280, 1283 (9th Cir.1977); *Callaway Golf Corp. v. Royal Canadian Golf Ass'n*, 125 F.Supp.2d 1194, 1199 (C.D.Cal.2000). Here the Court has reviewed the detailed affidavits submitted by the parties, considered the admissibility of the evidence offered in support and opposition to the motion, and made the findings set forth above. Accordingly, the Court concludes that Plaintiffs bear the burden of establishing the requisite jurisdictional facts to pursue their claim, and must make more than a prima facie showing, which would be the case where a hearing was not held.

### B. THE CONSTITUTIONAL REQUIREMENTS FOR EXERCISING PERSONAL JURISDICTION

In deciding whether the Court's exercise of jurisdiction over a defendant is proper, the law of the state in which it sits should be applied. *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998); *Callaway Golf Corp.*, 125 F.Supp.2d at 1199. The long arm statute of California allows the Court to exercise personal jurisdiction over a nonresident defendant to the same extent as that permitted by the Due Process Clause of the Constitution. *Id.* The Constitution requires that a defendant have minimum contacts with the forum state such that the exercise of jurisdiction does not violate "traditional notions of fair play and substantial justice." *Calder v. Jones*, 465 U.S. 783, 788, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)(*citing International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

Personal jurisdiction may be founded on either general or specific jurisdiction. *Panavision*, 141 F.3d at 1320. Because Plaintiffs concede that the Court has no basis for exercising "general" jurisdiction, this motion focuses entirely on the requirements for exercising "specific juris-

---

site provides a link to "our" ocnow.com cite, and both are operated by Cox Interactive Media, Cox Communications. (Gold Decl. Exs. F, G, J).

**3.** Also according to Burgar, in June 2000, unbeknownst to him, VBN was purchased by the Boston, Massachusetts based company, Engage Media. Engage Media Canada also has servers in Toronto. Upon learning of this sale, Burgar claims to have terminated Celebrity 1000's relationship with Engage Media. (Burgar Supp. Decl. ¶ 36).

diction." The Ninth Circuit has developed a three part test to apply when determining whether exercise of specific jurisdiction over a particular defendant is proper.

(1) The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avalls himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which aries out of or results from the defendant's forum-related activities; and (3) exercise of jurisdiction must be reasonable.

*Panavision,* 141 F.3d at 1320; *Callaway Golf Corp.,* 125 F.Supp.2d at 1199–1200.

### 1. Purposeful Availment

■ The purposeful availment requirement is satisfied by "deliberate action" on the part of the nonresident defendant toward the forum state. *Panavision,* 141 F.3d at 1320 (*citing Ballard,* 65 F.3d at 1498). "It is not required that a defendant be physically present within, or have physical contacts with, the forum, provided that his efforts 'are purposefully directed' toward forum residents." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). In the context of tort actions, this element can be satisfied by conduct that "is aimed at or has an effect in the forum state." *Panavision,* 141 F.3d at 1320 (*citing Ziegler v. Indian River County,* 64 F.3d 470, 473 (9th Cir.1995)). This variant on "purposeful availment," the so-called "effects test," was established in *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). Under that test, a court may properly exercise personal jurisdiction where there is shown to be "(1) intentional actions (2) expressly aimed at the forum state (3) causing harm, the brunt of which is suffered—and which the defendant knows is likely to be suffered—in the forum

state." *Core–Vent v. Nobel Indus.,* 11 F.3d 1482, 1486 (9th Cir.1993).

### 2. Purposeful Availment and the Internet

Two cases in this circuit have addressed the purposeful availment element in the context of the internet. In *Cybersell, Inc. v. Cybersell, Inc.,* 130 F.3d 414, 419–20 (9th Cir.1997), Cybersell–FL registered and used the domain name "cybersell.com," which was a service mark owned by Cybersell–AZ. Cybersell–AZ argued both that Cybersell–FL had purposely availed itself of the privilege of doing business in Arizona because of the nature and quality of its contacts with the state, and because of the "effects" the infringement would have in Arizona. The court disagreed. The court held that an exercise of personal jurisdiction over the nonresident defendant was not appropriate where the only contact defendant had with the forum state was the maintenance of a web page generally accessible over the internet, even though the web page solicited business from those who accessed the site. With respect to "effects," the court concluded that "Cybersell FL's web page was not aimed intentionally at Arizona knowing that harm was likely to be caused there to Cybersell AZ," even though it allegedly utilized Cybersell AZ's service mark as its internet domain name. *Id.* at 420. For both reasons, the Ninth Circuit concluded that the district court could not exercise personal jurisdiction over the Florida defendant. *Id.*

In *Panavision,* however, the court affirmed an exercise of personal jurisdiction over a nonresident defendant because defendant's alleged out of state scheme to register domain names, which incorporated trademarks of California companies, yielded effects primarily felt in the forum state of California. *See* 141 F.3d at 1318. The court wrote:

[T]he present case is akin to a tort case. [Defendant] purposefully registered Panavision's trademarks as his domain names on the Internet *to force Panavision to pay him money.* The brunt of the harm to Panavision was felt in California. [Defendant] knew Panavision would likely suffer harm there because, although at all relevant times Panavision was a Delaware limited partnership, its principal place of business was in California, and the heart of the theatrical motion picture and television industry is located there.

*Id.* at 1321 (citations omitted)(emphasis added). The *Panavision* court found that the defendant had registered Panavision's domain name "for the purpose of extorting money from Panavision," which was conduct that defendant knew would likely injure Panavision in California, where its business was centered. Thus, the court concluded, "under the 'effects test,' the purposeful availment requirement necessary for specific, personal jurisdiction is satisfied." *Id.* at 1322.

### 3. Analysis of Defendants' Conduct in This Case

#### (a) Business Contacts

■ Plaintiffs argue that Defendants' cyberspace activities constitute purposeful availment of the privilege of conducting activities in the forum because their activities allegedly extend beyond mere registration and use of the internet address kevinspacey.com. According to Plaintiffs, these additional activities include the solicitation of advertisements from California businesses directed toward California consumers, and the negotiation for their placement on the Celebrity 1000 website. Notably, however, Plaintiffs provide only two specific examples of the alleged conduct, the placement of banner ads for "LAinsider.com" and for "ocnow.com." This evidence falls short of establishing "purposeful availment" in several respects. First, Plaintiffs have presented evidence showing only that these specific ads ran for a few days each during a limited period of time, and have not provided any evidence that similar ads were placed and run at any other time. Second, although the ads deal with entertainment in the Southern California area, Plaintiffs present no evidence that California businesses own and operate the two internet-based guides, or that Burgar holds an ownership interest in either the guides or the companies advertised in the guides. Third, Plaintiffs have not presented evidence that the named Defendants in this case arranged for the placement of the "LAinsider.com" and "ocnow.com" banners ads on the Celebrity 1000 website. In contrast, Defendants present a detailed explanation regarding the sale of the banner ad space to a third party, where that third party then negotiated with advertisers for the placement of banner ads. Thus, given the dearth of evidence regarding the volume of advertising business placed on the website, the unknown domicile of the business owners of the two allegedly relevant advertisements, and the attenuated involvement of Defendants with those allegedly relevant ads, the Court concludes that the conduct falls short of "purposeful availment" as that term is used in personal jurisdiction jurisprudence.

In an apparent effort to overcome these deficiencies, Plaintiffs assert that Defendants solicit California advertisers for the Celebrity 1000 website by making public the website's demographic information. (Compl. ¶ 31 and Ex. D; Opp. at 9). Based on this information, Plaintiffs contend that Burgar purposefully availed himself of the privilege of doing business in California by deriving a financial benefit from California, even if such benefit occurred by way of an advertising broker. (Compl. ¶ 31; Opp at 9). The argument will not withstand analysis.

First, the evidence establishes that Engage Media—not Burgar or his companies—publishes the demographic data on which Plaintiffs base the argument that California residents make more use of the site than users in any other state. (See Opp. at 9; Fryhling Decl. ¶ 3 and Ex. L). Moreover, the supposed demographic data consists of the briefest of conclusions with no foundational backup. The Court lacks even the most basic information regarding the statistical methodology used to develop that information, and therefore lacks any means of testing the conclusions reached by those who collected the data. Further, the Court finds this lack of foundational information even more troubling given the surveyor's incredible conclusion that 100% of the users who have accessed the website reside in only three states—California, Texas and New York. The Court finds such an assertion inherently unbelievable, particularly when the website, accessible worldwide, supposedly derives 75% of all traffic from the United States. (See Burgar Supp. Decl. ¶ 37). While the Court acknowledges that the entertainment industry is a major employer in Southern California, the desire for information about show business celebrities—however frivolous an interest that may be—extends even to the hinterlands where television has been available for going on six decades. Though the site contains information about many who live and work in the media centers of New York and Los Angeles, its appeal undoubtedly extends far beyond those locales. How far may not be known, but certainly any claim that the site is of no interest to, and has not been accessed by, any resident in 47 of the 50 states must be rejected.

Absent any reliable evidence that Defendants were involved in the solicitation and negotiation of advertisement placements, and that such placements included forum-based contracts, conclusory statements on the matter are insufficient. *See GTE New Media Servs. Incorp. v. BellSouth Corp.,* 199 F.3d 1343, 1349; *see also Nissan Motor Co. v. Nissan Computer Corp.,* 89 F.Supp.2d 1154, 1159–60 (C.D.Cal.2000)(finding defendant's transaction of business in California satisfied the purposeful availment test where specific evidence existed illustrating defendant's personal involvement in contracts with forum companies to display company advertising banners and links on his website). Therefore, the Court concludes Plaintiffs have failed to meet their burden of demonstrating that Burgar engaged in commerce with California sufficient to warrant the exercise of personal jurisdiction over the Defendants.

### (b) "Effects"

Because insufficient evidence has been presented to show that the Defendants entered into advertising contracts with California businesses, or entered into any other kind of contractual arrangement with any California entity, the Court concludes that Defendants have not, in that respect, "purposefully availed" themselves of the privilege of doing business in California. For that reason, the Court next turns to the *Calder* "effects" doctrine, as applied to the internet context in *Cybersell* and *Panavision.*

■■■ Whether the "effects test" confers jurisdiction on the Court turns on whether this case is more similar to *Cybersell* or to *Panavision.*[4] *Cybersell* teaches that the

---

4. The parties argue over the applicability of *Pavlovich v. Superior Court,* 91 Cal.App.4th 409, 109 Cal.Rptr.2d 909 (2001). However, that case involved the theft of a California company's trade secrets, and the repeated re-

publication of those trade secrets on the internet, where knowledge of the trade secrets could be used to defeat encryption based copy protection systems with the ultimate objective

misappropriation of a service mark, which the misappropriater then uses as a domain name, does not satisfy the effects test even when the misappropriater operates a web page accessed through that domain name. Because the website could be accessed by any person with internet access, the Ninth Circuit concluded that the website operator's conduct was not expressly aimed at the forum state, and that its effects could not be said to be felt primarily in that state. 130 F.3d at 419–20. This Court further notes that the *Cybersell* court reached this decision even though the alleged infringer operated a website that solicited business from internet users, and advertised an e-mail address and a telephone number through which the website owners could be contacted. *Id.* at 415–16. Even so, the Ninth Circuit concluded that, without something more, such conduct failed to satisfy the minimum contacts required to warrant the exercise of personal jurisdiction over the defendant. Consistent with that analysis, *Panavision* advises that the "something more" would include an attempt to extort money out of a trademark owner who was attempting to retrieve control over the use of that mark from the misappropriater. 141 F.3d at 1322.

Here that additional element is missing. Unlike the cybersquatter in *Panavision*, Burgar and the Kevin Spacey Club have never demanded money from Spacey in exchange for the transfer of the registered domain name, and insist that they have no intention of doing so. Indeed, when Plaintiffs made an offer to purchase the name—

perhaps seeking to bring themselves within the scope of *Panavision*—Defendants never responded. Nevertheless, Plaintiffs insist that Defendants misappropriated Spacey's name, used it in connection with a website that is "aimed" at the Southern California entertainment industry, and knew that the harm to Spacey's reputation and goodwill would be felt primarily in Southern California. That argument differs little from the unsuccessful argument made by Cybersell–AZ, the owner of a registered mark and a company doing business in Arizona, where the brunt of the harm from the misappropriation of the mark was likely to occur in Arizona. In the Court's view, the likelihood that Spacey would be injured in California is no greater than the likelihood that Cybersell–AZ would suffer injury in Arizona. The Court disagrees with the premise that the site at issue is aimed at Southern California or at the entertainment industry. While the website focuses on celebrities and the entertainment industry as a subject, it appears aimed at fans who live and work all over the world, and who want information regarding even the most banal aspects of the lives of their favorite celebrities. Moreover, unlike the alleged misappropriater in *Cybersell*, the operator of a related, if not competing, business to that operated by the service mark owner, the offending website in this case promotes the adulation of the listed celebrities, whether or not the celebrity authorized the listing. The Celebrity 1000 website expressly disclaims any endorsement of the site by the listed celebrities, and nothing in

---

of permitting the misappropriation of copyrighted motion pictures. The defendant admitted that both the computer technology industry and the motion picture industry had a substantial presence in California; that 73 of the 400 companies licensed to produce motion picture DVD's were located in California; that the pirating of copyrighted DVD's was illegal; and that his software promoted such

pirating. That defendant's actions were directed toward California businesses, and that potentially enormous effects would be felt in California could hardly be debated. Whatever one may say about the ethics of Burgar's conduct in this case, it is not remotely similar to Pavlovich's concerted assault on a variety of California based businesses.

the evidence presented, or in anything the Court has found by accessing Burgar's site, contains any derogatory statement about Spacey.

For these reasons, the Court concludes that Burgar's conduct does not meet the "effects" test for the exercise of in personam jurisdiction in this case.

### 4. Forum–Related Activities and Reasonableness

Because the Court concludes that Plaintiffs have failed to show that Burgar purposefully availed himself of the privilege of doing business in California under any version of that test, the Court need not determine whether the basis for the assertion of jurisdiction involved Defendants' forum related activities, or that the exercise of jurisdiction would be reasonable.

## IV.

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss for lack of personal jurisdiction is **GRANTED.**

IT IS SO ORDERED.

## ORDER RE: PLAINTIFFS' MOTION FOR RECONSIDERATION OR RELIEF FROM JUDGMENT

## I.

## INTRODUCTION AND SUMMARY

In the present lawsuit, Plaintiffs Kevin Spacey and his loan out corporation, M. Profitt Productions, Inc. (jointly referenced as "Spacey"), sue Jeffrey Burgar, a Canadian citizen, and the Kevin Spacey Club, a Canadian corporation, for allegedly misappropriating Spacey's name. Spacey contends that Defendants created an internet domain name <kevinspacey.com> and used that domain name to funnel internet traffic to Defendants' Celebrity 1000 website, a site whose files are physically located on computers in Canada. Defendants responded to the suit by moving to dismiss for lack of personal jurisdiction. On November 15, 2001, the Court granted that motion, concluding that Spacey had not shown either that Defendants had purposefully availed themselves of the privilege of doing business in California, or that jurisdiction could be exercised over the Defendants under the *Calder* "effects" variant of the purposeful availment doctrine. See *Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316 (9th Cir.1998); *Cybersell, Inc. v. Cybersell, Inc.,* 130 F.3d 414 (9th Cir.1997).

Now Spacey seeks reconsideration of the Court's ruling. Spacey claims that the Court should have determined only whether he presented a prima facie case of personal jurisdiction. Because he believes he met that standard, at least with respect to the so-called "effects" test, Spacey contends that the Court erred in its ruling and should deny the motion to dismiss upon reconsideration. In short, Spacey claims that he presented enough evidence to establish a prima facie case that Defendants intentionally directed conduct at a California resident with the effects being felt in California. In addition, Spacey supports his motion to reconsider with new evidence and legal authority—most of which was, or could have been, known when the Court considered the original motion.

After reviewing the moving, opposing and reply papers, in addition to the supplemental declarations submitted on behalf of both parties, the Court concludes that Spacey is not entitled to the relief sought in this reconsideration motion. Spacey fails to satisfy the requirements under Rule 60(b) or Local Rule 7–18 relating to this Court's consideration of new facts or law. Moreover, even assuming that the Court's November 15, 2001 Order stated an incorrect legal standard, application of the "prima facie case" standard, on which Spacey

relies, fails to change the result in this case. Accordingly, the Court DENIES Spacey's Motion.

## II.

## DISCUSSION

### A. THE LEGAL STANDARD UNDER FEDERAL RULE 60(b)(6)

Federal Rule of Civil Procedure 60(b) provides a procedure whereby a party may move for relief of a court's final judgment or order. Fed.R.Civ.P. 60(b)(1)-(6); *Lilje-berg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988). Rule 60(b)(6) serves as the catch-all provision, conferring on the court broad discretion to "relieve a party from final judgment 'upon such terms as are just,' provided that the motion is made within a reasonable time *and is not premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5)."* *Liljeberg*, 486 U.S. at 863, 108 S.Ct. 2194 (emphasis added); *see also Lafarge Conseils et Etudes, S.A. v. Kaiser Cement & Gypsum Corp.*, 791 F.2d 1334, 1337–38 (9th Cir.1986)(*quoting Corex Corp. v. United States*, 638 F.2d 119, 121 (9th Cir.1981)). While courts have never defined what is meant by "just terms," case law teaches that this section should be applied only in extraordinary circumstances. *Liljeberg*, 486 U.S. at 865, 108 S.Ct. 2194 (*citing Klapprott v. United States*, 335 U.S. 601, 614–15, 69 S.Ct. 384, 93 L.Ed. 1099 (1949); *Ackermann v. United States*, 340 U.S. 193, 200, 71 S.Ct. 209, 95 L.Ed. 207 (1950)); *see also United States v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir.1993). "Extraordinary circumstances" do not include situations in which "a litigant who has let the normal appeals channels lapse seeks to have a second bite at the apple." *United States v. Wyle*, 889 F.2d 242, 250 (9th Cir.1989).

Under this provision, the Court concludes that it may, and should, consider whether or not it applied an incorrect legal standard to the analysis of the facts presented at the time of the prior motion. Accordingly, the Court will reconsider that aspect of its prior ruling.

### B. SPACEY'S REQUEST FOR RECONSIDERATION OF THE APPLICABLE STANDARD FOR ESTABLISHING PERSONAL JURISDICTION OVER NON-RESIDENT DEFENDANTS

Spacey argues that, had the Court required only that he make a prima facie case for the exercise of personal jurisdiction over Defendants, the Court would have concluded, at the very least, that Defendants were subject to this Court's jurisdiction under the "effects" test established in *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). Defendants, on the other hand, take the position that no matter the label used by this Court in articulating the applicable legal standard, Spacey fails to establish the requisite jurisdictional facts to support this Court's exercise of personal jurisdiction over either Defendant.

Spacey's argument amounts to a claim that, under the prima facie case test, this Court must accept the truth of every allegation plaintiff makes regardless of whatever other information is found in the record. That position finds no support in the case law. While the November 15, 2001 Order may have incorrectly articulated the applicable standard, the Court believes it correctly analyzed the record and properly granted Defendants' Motion to Dismiss.

### 1. The Legal Standard for Motion to Dismiss Under Rule 12(b)(2)

The party seeking to invoke federal court jurisdiction has the burden of proving that the court may properly assert jurisdiction over each defendant. *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir.

2001) (citation omitted); *Data Disc, Inc. v. Systems Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir.1977) (citation omitted). "Yet the quantum of proof required to meet that burden may vary, depending upon the nature of the proceeding and the type of evidence which the plaintiff is permitted to present." *Data Disc,* 557 F.2d at 1285. Where a court looks only to the pleadings and other written materials submitted by the parties, a plaintiff need only make a prima facie showing of facts that support a finding of jurisdiction. *Ballard v. Savage,* 65 F.3d 1495, 1498 (9th Cir.1995)(*citing Data Disc,* 557 F.2d at 1285).

▮▮▮ ·In determining whether a plaintiff has satisfied this burden, the plaintiff's version of the facts are taken as true when not directly controverted, and conflicts in the allegations contained in the parties' affidavits are also resolved in plaintiff's favor. *Unocal Corp.,* 248 F.3d at 922 (*citing AT & T Company v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 588 (9th Cir.1996)). "Except in those rare cases where the facts alleged in an affidavit are inherently incredible, and can be so characterized solely by a reading of the affidavit, the district judge has no basis for a determination of credibility." *Data Disc,* 557 F.2d at 1284. However, conclusory statements are not enough to satisfy a prima facie showing of jurisdiction without supporting evidence contained in the record. *GTE New Media Servs. Inc. v. BellSouth Corp.,* 199 F.3d 1343, 1349 (D.D.C. 2000). As the Court noted in *GTE New Media,* to assume or infer the existence of "effects" sufficient to give rise to jurisdiction on the basis of conclusory assertions to that end "would be to assume or infer the answer to the very question that is before us." *Id.*

Thus, the Court must examine the entirety of the record before it, determine what facts are not in dispute, resolve genuine fact disputes in plaintiff's favor, and then decide whether a proper basis for personal jurisdiction has been shown. The Court conducted such an analysis once and concluded that Spacey had not shown a proper basis for the exercise of personal jurisdiction. On reconsideration, the Court reaches the same conclusion.

### 2. The Court's Reconsideration of the Evidence

In resolving Defendants' Motion to Dismiss, the Court identified the material factual allegations in dispute, determined whether any of these allegations were conclusory in nature and without support, and afforded the allegations proper weight in light of these determinations and relevant authority. (*See* Order at 7–8). The Court considered whether Defendants Burgar and Kevin Spacey Club had purposefully availed themselves of the privilege of conducting activities in the forum under both the traditional test and the variant *Calder* "effects" test, and concluded Spacey failed to meet his burden in establishing the requisite jurisdictional facts under either test. (*See* Order at 9–15).

Spacey does not challenge the traditional purposeful availment analysis of the prior order; rather he argues that he established a prima facie case for jurisdiction under the *Calder* "effects" test. What Spacey fails to consider in framing these arguments, however, are the Ninth Circuit decisions in *Cybersell, Inc. v. Cybersell, Inc.,* 130 F.3d 414 (9th Cir.1997) and *Panavision Int'l, LP v. Toeppen,* 141 F.3d 1316, 1322 (9th Cir.1998), which this Court addressed in great detail in assessing Spacey's "effects" argument.

In *Cybersell,* the plaintiff, who operated in Arizona under the same name as the Florida defendant, brought suit in Arizona for damages allegedly resulting from defendant's trademark infringement. Even

though the "effects" of the Florida defendant's conduct were allegedly felt in Arizona, the court found the website operator's conduct was not expressly aimed at the forum state. Moreover, given the nature of the internet, the Court held that the effects of the Florida defendant's conduct could not be said to be primarily felt in that state, even though the alleged infringer operated a website that solicited business from internet users, and advertised an e-mail address through which the website owners could be contacted. 130 F.3d at 415–20. Thus, the court concluded "something more" was needed to warrant the exercise of personal jurisdiction. *Id.* Here, the Court compared Spacey's allegations regarding Defendants' cyberspace activities, including those relating to the Celebrity 1000 Website's alleged forum-related advertisements, and Spacey's presence in the forum, and concluded the arguments were similar to those rejected by the court in *Cybersell.* (Order at 15). The Court also found significance in the fact that, unlike the website at issue in *Cybersell,* the Celebrity 1000 Website is not competing with, or even related to, a website operated by Spacey and that the Celebrity 1000 Website expressly disclaims any endorsement of the celebrities listed on the site. (*Id.*)

In *Panavision,* the court affirmed the exercise of personal jurisdiction over a non-resident defendant because the court found that defendant, an alleged trademark infringer, registered the domain name at issue with the intent to extort money from the trademark owner. 141 F.3d at 1321–22. Thus, the court concluded that the "something more" needed to satisfy the "effects" test existed under the facts presented. *Id.* at 1322. Here, the Court pointed out that unlike the defendants in *Panavision,* it is undisputed that Defendants Burger and the Kevin Spacey Club made no attempt to obtain money from Spacey in exchange for the transfer of the registered internet domain name <kevinspacey.com>. (Order at 14). Thus, the Court found the "something more" needed to satisfy the test did not exist in the present action, as the facts here are more in line with those in *Cybersell.* (*Id.* at 13–14).

Since the motion to reconsider was filed, Spacey filed a Notice of Recent Decision on April 25, 2002, noting the Ninth Circuit's recently published decision in *Rio Properties, Inc. v. Rio Intern. Interlink,* 284 F.3d 1007 (9th Cir.2002). Even assuming that Rule 7–18 and Federal Rule of Civil Procedure 60(b) permit consideration of this decision, *Rio* requires no change in the Court's analysis or application of the "effects" test.

In *Rio,* plaintiff Rio Properties, a hotel and casino operator, sued defendant Rio International Interlink, operator of an internet gambling website, for infringement of its "RIO" trademarks. Rio Interlink claimed that it did nothing more than operate a passive website, in the manner of the defendant in *Cybersell.* But the trial court found that Rio Interlink not only operated a website that offered the opportunity to Nevada residents to gamble on line, but it also allegedly ran print and radio advertisements in Nevada, the center of the gaming industry, specifically aimed at Nevada residents for the purpose of inducing them to do their gambling on line. *Id.* at 1020. Thus, the court concluded that the exercise of personal jurisdiction was proper because the non-resident defendant had "contacts with the forum ... attributable to (1) intentional acts; (2) expressly aimed at the forum; (3) causing harm, the brunt of which is suffered—and which the defendant knows is likely to be suffered-in the forum." *Id.* at 1019–1020 (citations omitted.) Thus, both the trial court and the Ninth Circuit found the "something more" required under the *Cybersell* analysis to justify the exercise of

personal jurisdiction over an out-of-state website operator. But that "something more" is not present here.

In this case, Spacey cannot allege that the website operator specifically directed its activities toward the state of California. Rather, the operator sought to satisfy the national and, indeed, international appetite for trivia regarding the lives of "celebrities." Defendants, or their related corporations, sold advertising space to brokers who then placed ads on the site. But the ads did not solicit business for the web operator—they sought business for the advertisers themselves, none of whom are alleged to have engaged in any wrongdoing toward Spacey. Likewise, Spacey, who has acknowledged that he is a resident of New York, has failed to present evidence that the effects of Defendants' activities would be felt primarily in California, as opposed to New York or some other state.

Overall, regardless of the designation given to the standard of proof, the Court held that Spacey failed to establish jurisdiction under the "effects" test in light of Ninth Circuit precedent. This Court's reconsideration of the applicable legal standard does not change the Court's ultimate conclusion that, based upon the jurisdictional facts before this Court, Defendants' cyberspace activities were not aimed at the forum, and the brunt of any harm to Spacey's name and goodwill caused by Defendants' alleged wrongdoing would not necessarily be felt here. In short, Spacey has not presented a prima facie case for the exercise of personal jurisdiction over Defendants.

### C. SPACEY'S ALLEGED NEW FACTS

In addition to arguing that the Court applied the wrong standard in deciding the present motion, Spacey asks the Court to consider new facts that supposedly clarify his relationship with M. Profitt, and new evidence relating to advertisements displayed on the Celebrity 1000 Website. While Spacey seeks this relief under Rule 60(b)(6), the Court must analyze the request under Rule 60(b)(2), as the latter governs requests for relief based on newly discovered evidence. After reviewing Spacey's papers, the Court concludes he has failed to present any new facts that justify a reconsideration of the Court's November 15, 2001 Order.

Rule 60(b)(2) permits relief from judgment on the basis of "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)." Fed.R.Civ.P. 60(b)(2); *see also Jones v. Aero/Chem Corp.*, 921 F.2d 875, 878 (9th Cir.1990). This provision finds its counterpart in Local Rule 7–18, which limits the grounds for reconsideration motions, and includes as one of those grounds "a material difference in fact ... from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision." Local Rule 7–18; *see also McMichael v. United States Filter Corp.*, No. 99–182VAP, 2001 WL 418981, at *17 (C.D.Cal. Feb.23, 2001).

To prevail on a motion for reconsideration on the basis of newly discovered evidence, the moving party must demonstrate that while the evidence existed at the time the court initially addressed the issue, it could not have been discovered through due diligence. *Jones v. Aero/Chem Corp.*, 921 F.2d at 878; *Coastal Transfer Co. v. Toyota Motor Sales*, 833 F.2d 208, 211–12 (9th Cir.1987). Moreover, the moving party must also show that the evidence is "of such magnitude that production of it earlier would have been likely to change the disposition of the case." *Aero/Chem*, 921 F.2d at 878 (*quoting Coastal Transfer Co.*, 833 F.2d at 211–12). Spacey has failed to do either.

### 1. Spacey's Relationship with M. Profitt

Spacey postulates that the Court misunderstood his relationship with M. Profitt, and therefore failed to consider this relationship in the Court's jurisdictional analysis under the *Calder* "effects" test. According to Spacey:

> [w]hen M. Profitt Productions was formed, I granted it the exclusive right in the United States to use my name, trademarks, identity and persona for purposes of entering into agreements with third party film, television and stage producers to provide my personal acting and related publicity services.

(Nov. Spacey Decl. ¶ 1). Thus, Spacey seems to argue that since M. Profitt held those rights, and since M. Profitt is a California corporation, the "effects" of Defendants' conduct was felt most directly in California even though Spacey is domiciled in New York.

First, the Court notes that there can be no dispute that this information, which purports to clarify M. Profitt's rights to the use of Spacey's intellectual property, was actually known to Spacey at the time this Court initially addressed Defendants' Motion to Dismiss. Spacey presents no explanation for his failure to present this information to the Court at that time, particularly where the Court even addressed the matter during the hearing on Defendants' Motion. *See Barber v. Hawaii*, 42 F.3d 1185, 1198 (9th Cir.1994)(holding a district court did not abuse its discretion in denying a request for reconsideration of a summery judgment motion because the moving party presented no reason why the newly proffered affidavits could not have been obtained prior to the court's hearing on the summary judgment motion).

Moreover, notwithstanding the existence of this information, Spacey's effort to clarify his relationship with M. Profitt consists of a conclusion—that he transferred his rights of publicity to M. Profitt—which is contradicted by the evidence he offered in support of the proposition. When queried by the Court, Spacey was unable to produce any documentation evidencing this "conveyance," arguing instead that it was an "oral" transaction. (Notice of Compliance with Court's March 4, 2002 Minute Order ("Notice") at 2). However, the inducement letters and contracts between Plaintiffs and various movie studios, offered by Spacey as evidence to support the existence of this oral conveyance, actually suggest Spacey has not conveyed his rights of publicity to M. Profitt.

In one case, Spacey alone conveys his rights of publicity in connection with the anticipated creation of documentaries about the development and production of the motion picture entitled "American Beauty." (Notice Ex. D at 53). In other instances, Spacey alone holds the right of approval with respect to photographs used in connection with the advertisement and exploitation of a respective motion picture. (Notice Ex. D at 51–52; Ex. E at 113–14; Ex. G at 151). And in those contracts where M. Profitt conveys whatever rights it owns, Spacey also joins in the conveyance of those rights. (Notice Ex. E at 110–11; Ex. F at 144; Ex. G at 172). In short, the only party who appears in all of these documents is Spacey himself. In no instance does any company accept a conveyance by M. Profitt without a conveyance by Spacey. Thus, the evidence presented fails to support the conclusion that Spacey "conveyed" his rights of publicity to M. Profitt in an undocumented oral transaction.

### 2. Celebrity 1000 Website Advertisements

Spacey also presents evidence—alleged to be "newly discovered"—of additional ad-

vertisements displayed on the Celebrity 1000 Website, where such advertisements apparently relate to companies incorporated and/or doing business in California, Spacey presents this evidence to support his allegation that Defendants derive revenue from advertisements displayed on the Celebrity 1000 Website, and thus, that Defendants receive a financial benefit from the forum. After reviewing Spacey's papers, however, the Court concludes that even if Local Rule 7–18 allows for the Court's consideration of a portion of this new evidence, its content does not alter the Court's earlier jurisdictional analysis.

With respect to the ad information that preceded the Court's resolution of Defendants' Motion to Dismiss, Spacey fails to explain why this evidence, easily uncovered through the use of the internet, could not have been obtained through reasonable diligence at the time of the original resolution of Defendants' Motion. (*See* Declaration of Kristin R. Allen ("Allen Decl.") ¶¶ 6–7; Exs. F–H). Accordingly, the Court concludes this portion of the new evidence fails to satisfy the requirements under Rule 60(b)(2) or Local Rule 7–18.

Some of the evidence presented did not exist at the time of this Court's original consideration of the jurisdiction issue, however, and relates to advertisements that were displayed on the Celebrity 1000 Website after the Court entered its November 15, 2001 Order. (*See* Allen Decl. ¶¶ 2–5; Exs. C–E). Specifically, Spacey presents evidence of one banner advertisement displayed on the Celebrity 1000 Website on November 29, 2001, and two banner ads displayed on the site on November 30, 2001. (*See* Allen Decl. ¶ 2–5; Ex. C–E). After researching the domain name owners for these three banner advertisements, Spacey represents that two of the owners are California corporations, and the third corporate owner is qualified to do business in California. (*Id.*) Thus, Spacey asserts

this evidence supports a showing of purposeful availment under both the traditional test and the variant *Calder* "effects" test.

Local Rule 7–18(b) provides for the reconsideration of a motion on the basis of the "emergence of new material facts ... occurring after the time of such decision," which may include this new evidence relating to the relevant advertisements displayed on the Website after the Court's November 15, 2001 Order. After reviewing the evidence, however, the Court finds it does not support Spacey's contention that the named Defendants in this action purposefully availed themselves of the privilege of conducting business in California, because the information is not materially different than the evidence previously considered by this Court in its November 2001 Order. Unlike the evidence relating to LAInsider.com and ocnow.com, this new evidence does provide the name and domicile of the business owners for these three advertisements. However, Spacey fails to address the concerns previously raised by the Court regarding the lack of any connection between the placement of the ads and any conduct by Defendants, and fails to address how these facts change this Court's *Cybersell* and *Panavision* analysis.

Therefore, the Court concludes that a reconsideration of the Court's jurisdictional analysis on the basis of Spacey's newly presented evidence would not support a showing of purposeful availment under the traditional test.

### D. Spacey's New Legal Basis for Personal Jurisdiction

Spacey also moves this Court to consider an alternative legal basis for personal jurisdiction under Rule 60(b)(6), asserting Federal Rule of Civil Procedure 4(k)(2) provides a basis for general jurisdiction. Defendants counter Spacey's newly proffered basis for jurisdiction should not be

considered by this Court, because Spacey made a deliberate choice not to include the argument in his initial opposition to Defendants' Motion to Dismiss. The Court agrees.

Again, Spacey's request is more appropriately analyzed under Rule 60(b)(2) because the relief sought calls for this Court's consideration of newly presented evidence relating to Defendants' total national contacts with the United States. The evidence includes factual allegations contained in declarations submitted by Mr. Burgar in support of Defendants' Motion to Dismiss, and citations to a decision in an earlier case brought against Mr. Burgar. (*See* Mot. at 13–14). In light of the nature of this evidence, and its availability during the original resolution of Defendants' Motion to Dismiss, the Court questions the propriety of any argument that attempts to explain why it was not presented to the Court at an earlier time. Therefore, neither Rule 60(b)(2) nor Local Rule 7–18 justifies this Court's reconsideration of Defendants' Motion in light of this new legal basis for jurisdiction.

■ Nonetheless, even if the Court were to consider Spacey's request under Rule 60(b)(6), the conclusion remains unchanged. Spacey did not raise the Rule 4(k)(2) basis for personal jurisdiction in his opposition to Defendants' Motion to Dismiss, and this Court need not address an issue raised for the first time in a reconsideration motion. *Novato Fire Protection Dist. v. United States*, 181 F.3d 1135, 1141, n. 6 (9th Cir.1999) (citation omitted)("A district court has discretion to decline to consider an issue raised for the first time in a motion for reconsideration."); *Pacific Far East Lines, Inc.*, 889 F.2d at 250 (stating Rule 60(b)(6) motions are not a mechanism for obtaining a "second bite at the apple" when the first litigation strategy did not yield success). Therefore, the Court declines to consider Spacey's new legal basis for personal jurisdiction at this stage in the litigation.

### E. SPACEY'S REQUEST FOR JURISDICTIONAL DISCOVERY

As a final alternative for relief, Spacey moves this Court to reconsider the earlier oral request for jurisdictional discovery made during the Court's October 15, 2001 hearing on Defendants' Motion to Dismiss. Defendants respond that Spacey has not made a showing that jurisdictional discovery is warranted, because it would not change the end result that personal jurisdiction does not exist in the present forum.

Although this alternative request for relief is also made pursuant to Rule 60(b)(6), Spacey fails to explain why such a request is based on circumstances of the extraordinary nature that are contemplated by this catch-all provision. Moreover, under Local Rule 7–18, Spacey is not entitled to repeat any written or oral argument made in opposition to the original motion to dismiss. Accordingly, the Court concludes Spacey is not entitled to a reconsideration of the decision that Defendants' Motion was capable of resolution without the granting of time for jurisdictional discovery. *See America West Airlines, Inc. v. GPA Group Ltd.*, 877 F.2d 793, 800–01 (9th Cir.1989)(holding the district court did not abuse its discretion in deciding the jurisdictional issue without allowing time for discovery, as the information sought would not likely be relevant).

### III.

### CONCLUSION

For the reasons set forth above, the Court DENIES Plaintiffs' Motion for Reconsideration or Relief from Judgment.

IT IS SO ORDERED.